[Civ. No. 23051.   Second Dist., Div. Three.   Aug. 31, 1959.]

MATT PATRITTI et al., Respondents, v. W. M. GLASSELL et al., Appellants.

Anderson & Anderson and Earle K. Stanton for Appellants.

Wolford, Johnson & Pike and Jean Wunderlich for Respondents.

WOOD (Parker), J.—Plaintiffs sought a declaration as to the rights of plaintiffs and defendants in certain real property which was the subject of a condemnation action, or a declaration as to their rights in the condemnation award.

In a nonjury trial, the judgment provided that plaintiffs were entitled to half of the condemnation award after deducting certain amounts from the gross award, and that the defendants were also entitled to half of the net award; plaintiffs were the owners of an undivided half interest in the oil rights; defendants were the owners of a half interest in the oil rights; defendants were ordered to execute a deed conveying to plaintiffs a half interest in the oil rights.

Defendants appeal from the judgment.

Appellants contend that the evidence does not support certain findings, and the court erred in rulings as to the admissibility of evidence.

Appellants' principal argument is that the trial judge made a new contract for the parties and improperly ordered specific performance of the contract.

Plaintiff Patritti was president of plaintiff Gladstone Holmes, Inc., a corporation which was in the business of subdividing land. Plaintiff Mrs. Ord, who was a licensed real estate broker, was in the business of obtaining the exclusive right to sell unimproved land and thereafter offering to sell the land to Gladstone Holmes, Inc. Defendants Mr. and Mrs. Glassell owned approximately 45 acres of agricultural land.

In February, 1954, Mrs. Ord asked Mr. Glassell if the land was for sale. Mr. Glassell replied that he would sell it for $3,150 an acre net. In April, 1954, Mrs. Ord and Mr. Patritti had a conversation with Mr. Glassell regarding an option to

purchase the land for subdivision purposes. Thereafter Mrs. Ord prepared an option agreement which provided that in consideration of $1,000 paid to Mr. Glassell by Gladstone he gave Gladstone the exclusive option until September 10, 1954, to purchase the land for $3,150 an acre net. The option provided: "This purchase subject to rezoning of 6,000 sq. ft. lots. Approval of all boards necessary for a sub-division, i. e., Planning, Health Dept., Fire Dept., Real Estate Commission, Flood Control. If for any reason this sub-division is not approved by any one of the above boards, the $1,000.00 is to be refunded to buyer." On May 11, 1954, Mr. Patritti gave his personal check for $1,000 to Mr. Glassell and, on that day, the option was signed by Mr. and Mrs. Glassell and by "M. Patritti, President—Gladstone Holmes, Inc."

Thereafter Mr. Patritti prepared, and Mr. Glassell signed, a petition to rezone the land into 5,000 square-foot lots, and on June 17, 1954, the petition was filed with the planning commission. On June 27, 1954, a hearing was held by the planning commission on the petition for rezoning.

On July 23, 1954 (during the time Gladstone Holmes had the option), "Gladstone Homes," as "Record Owner" and "Subdivider," filed with the planning commission an owner's statement and tentative subdivision map.

On August 16, the Division of Highways sent a letter to Patritti stating that the state engineers had certified that the entire tract would be necessary for the construction of a state highway, and that the division had initiated action to secure "Highway Commission approval and appraisals on the property which we anticipate will lead to the opening of negotiations with you for the purchase of the property by the State within a period of approximately four to six months. . . . As stated to you previously, the property will be appraised as potential subdivision land with a value substantiated by recent sales in the open market of similar properties."

On August 17, at the request of Patritti, the planning commission extended the time for consideration of the subdivision plans for a period of six weeks.

About August 18, Glassell, Ord, and Patritti had a conversation regarding the purchase of the land by the state. Patritti testified as follows: During that conversation he showed to Glassell the letter he (Patritti) had received from the Division of Highways. He told Glassell that the state was going to take all of the property; he was willing to pay to Glassell $3,150 an acre for the land; he would also give

Glassell 50 per cent of everything he (Patritti) received over $3,150 an acre from the state; if Glassell "would go along with it, he [Patritti] would . . . be able to get $5,000 an acre for his [Glassell's] property, if the State wanted" the property; he had arranged with the state to reserve the oil rights; if he and Glassell "go along on a fifty-fifty deal," he would also give to Glassell 50 per cent of those rights. Mrs. Ord inquired as to what would happen to her commission if the state took the property. Patritti or Glassell suggested that "they" set up a double escrow to take care of Mrs. Ord's commission. He (Patritti) said that if they had a double escrow "it would help increase the value of the property as far as the State was concerned," and it would help Patritti on his loan commitments on the property. Mrs. Ord "was to take an escrow" at $3,150 an acre and then she was to sell the property to Patritti at $4,200 an acre, "and by doing that it would tentatively raise the price of the property to help the State raise their sights on the property." Glassell said, "Well, you own the property, you go ahead and do the negotiating on it. . . . But just make sure I want thirty-one fifty an acre. I don't want to go through condemnation court on it." Glassell told Patritti and Mrs. Ord to see Glassell's attorney with respect to having the agreement written.

Mrs. Ord testified as follows: That during that conversation (of August 18) she showed to Glassell a copy of the letter from the Division of Highways, and she and Patritti told Glassell that the property "should bring around" $4,250 an acre from the state. She told Glassell and Patritti that the option should be transferred to her to "protect" her on the commission of 5 per cent of $3,150 an acre, which commission Patritti had agreed to pay to her. Patritti told Glassell that "we" wanted to set up an escrow between Mrs. Ord and Gladstone "to establish a new price" of $4,250 an acre for the land. Glassell said that he would have his attorney prepare a new option "as a three months' extension," and have him prepare an agreement between Glassell and Patritti "whereby that if the State took the property, Mr. Glassell and Mr. Patritti would split the difference above thirty-one fifty per acre, minus engineering costs and legal expenses." Glassell told Patritti to go "right ahead with the work he had been doing on it [the negotiations with the state] and the subdividing and pushing the subdivision and the State to a conclusion."

Mr. Glassell testified to the effect that he did not see the

original or a copy of the letter from the Division of Highways until after the present action was commenced; Patritti did not state, in the conversation of August 18, that the state was going to take all of the land.

On August 18, 1954 (when she had no ownership in, or option to buy, the land), Mrs. Ord signed an option agreement which provided that in consideration of $1,000 paid to her by Gladstone, she agreed to sell the land to Gladstone, at any time within six months, for $4,200 an acre, payable in cash, "when the tract goes to record."

On August 24, the planning commission acted favorably on the petition for rezoning.

About the first of September, Mrs. Ord and Patritti conferred with an attorney for the Glassells (not their attorney in this action) regarding an agreement between the Glassells and Patritti, and regarding an option agreement between the Glassells and Mrs. Ord. The attorney prepared such a proposed agreement and option agreement, and mailed them on September 8, 1954, to Patritti. Thereafter Patritti and the Glassells amended the agreement and signed it; and the Glassells and Mrs. Ord amended the option agreement and signed it.

That agreement between Patritti and the Glassells, as amended, is set forth in the margin.[1]

[1] "September 2, 1954

"Mr. and Mrs. Wm. M. Glassell

". . . . . . . . . . .

"This letter is to request the immediate termination and cancellation of that certain Real Estate Option executed by you in favor of Glad-Stone Homes, Inc. on May 11, 1954, with which option the undersigned paid you $1,000.00 as the consideration.

"We have arranged with Loretta M. Ord to take over our rights under said option, and to have prepared a new option, copy of which is attached hereto for your approval, dated today and running to and including the 10th day of December, 1954.

"We understand that you are willing to extend this option, as herein requested, upon cancellation of the old option, and to carry the credit of $1,000.00 paid by us to you on May 11, 1954 as the consideration for the extension of the option in the name of the new party to and including December 10, 1954.

"This letter is to release you from all liability to Gladstone Homes, Inc. on account of the said payment of $1,000.00, so that in the event that under the terms of the new option it should be necessary for you to repay that $1,000.00, it would be repaid to Loretta M. Ord and not to Gladstone Homes, Inc.

"If you approve of our request as herein stated, and execute the new and extended option, will you please acknowledge your acceptance of the conditions of this letter on the copy sent herewith and return said copy, signed by yourselves, to me? Your signatures so appearing on the copy of this letter, and transmitted to me, will effect the termina-

It appears that the agreement, although dated September 2, 1954, was not mailed to Patritti for approval until September 8, and that it was not signed by the Glassells until September 22.

The option agreement betwen the Glassells and Mrs. Ord, made on September 22, 1954, provided that in consideration of $1,000 paid to the Glassells by Mrs. Ord, the Glassells gave to Mrs. Ord the exclusive option, until December 10, 1954, to purchase the land for $3,150 an acre "net . . . in cash on delivery of deed" and certificate of title. The option included substantially the same provisions, regarding rezoning and approval by various boards, as were set forth in the original option agreement between the Glassells and Gladstone on May 11.

As above stated, the original option agreement, between the Glassells and Gladstone, provided that the option would expire on September 10, 1954. Gladstone did not exercise the option within the time provided. It thus appears that Gladstone did not acquire any ownership in the land by reason of that option. The new option agreement, between the Glassells and Mrs. Ord, was made on September 22, 1954 (after the expiration date provided in the Gladstone option.)

On September 21, the Highway Commission authorized the Division of Highways to acquire the property. On the same day, Patritti requested the planning commission to extend the

tion of the old option and transfer any rights I may have in the $1,000.00 consideration for the old option to Loretta M. Ord.

"This letter is further intended to commit and bind me to the following agreement with you:

"WHEREAS, I am making an arrangement with Loretta M. Ord for the sale and/or subdivision of the property involving the option, upon terms arranged between Loretta M. Ord and myself; I agree that if all or any part of the said property shall be sold to the State of California, you will reserve one-half of the oil and mineral rights and I will pay you ½ of all of the net proceeds of the sale over and above $3,150.00 per acre, after deducting engineering costs; and in the event that any condemnation proceeding involving the sale of said property shall go to trial, the legal expenses, court costs and expense of expert witnesses shall first be deducted.

"M. Patritti

"We hereby accept and approve the terms and conditions of the foregoing letter this *22nd* day of September, 1954.

"W. M. Glassell
"Mrs. Wm. M. Glassell"

(The amendment, above referred to, was made by inserting after the word "California," in the last paragraph, the following words: "you will reserve one-half of the oil and mineral rights and")

time for consideration of the subdivision plans for a period of two months, and the request was approved.

On September 22, Glassell received a letter, dated September 15, from the planning commission stating that the commission recommended that the land be rezoned into 6,000 and 7,500 square-foot lots.

Mrs. Ord testified as follows: That about October 1, she, Glassell, and Patritti had a conversation about opening an escrow. In that conversation she said that "we had this option at thirty-one fifty and that we should put it in escrow to definitely establish the price because there was—one or two alternatives. Either Mr. Patritti was going to buy it or the State was going to take it, and that we should be set up." Patritti and Glassell said that it "was agreeable" to open an escrow. At that time, Patritti told Glassell that he (Patritti) "was in a position to pay for the land at anytime that he wished, or to carry through on the agreement that had been written up by" Glassell's attorney. Glassell said "that he did not wish the money, that he would go along on the deal."

On October 5, Mrs. Ord and Gladstone signed escrow instructions for the sale of the land by Mrs. Ord to Gladstone. The purchase price, as stated therein, was $4,200 an acre. The instructions included a statement that $1,000 had been paid outside of escrow, and included a provision for the payment by Mrs. Ord of a commission of $9,450 to "Ord Realty." (When she signed the instructions she had not exercised the option to purchase the land. It thus appears that when she agreed to sell to Gladstone she had not acquired any ownership in the land.)

On October 7, the board of supervisors approved the recommendation of the planning commission regarding the change of zone.

On October 21 (after Mrs. Ord had signed instructions agreeing to sell to Gladstone), escrow instructions were prepared, at the request of Mrs. Ord, for the sale of the land to her by the Glassells. She signed the instructions before they were sent to the Glassells. The instructions stated that the purchase price was $3,150 an acre; that $1,000 had been paid outside of escrow; the escrow was contingent upon obtaining clearances from the different commissions responsible for subdivisions; that, as a matter of record only in the escrow, it was agreed that the buyers were not to do any work on the property until after close of escrow; that if the escrow company was unable to comply with the instructions on or prior

to January 21, 1955, it would comply as soon thereafter as possible unless a written demand terminating the escrow was made.

Also on October 21, the escrow company sent the instructions and a deed to the Glassells and requested them to sign and return the documents. On December 13, the escrow instructions, signed by the Glassells, were received by the escrow company. The Glassells did not at any time place a deed in the escrow.

On November 23, at the request of Patritti, the planning commission extended the time for consideration of the subdivision plans for a period of two weeks, and on December 7, pursuant to his request, the time was extended for a further period of two weeks. On December 14, at the request of Patritti, the planning commission approved the withdrawal of the subdivision plans.

On December 27, Mr. Baker, a right-of-way agent for the Division of Highways, sent a letter to Patritti, stating that the division was "as yet" unable to open negotiations regarding the land; several legal problems were involved which must be cleared; he would do all he could to expedite the matter; and Patritti would be contacted as soon as possible.

On January 4, 1955, Mrs. Ord sent a letter to the Glassells requesting them to extend the escrow for 30 to 60 days. In that letter she enclosed a copy of the Baker letter, above referred to.

On January 13, the Glassells and Mrs. Ord signed amendments to the escrow instructions, extending the time of the escrow to February 21.

On February 3, Baker, Glassell, Mrs. Ord, and Patritti had a conversation regarding a purchase of the land by the state. Mrs. Ord testified that Glassell told Baker "to deal with Mr. Patritti, that it was his property." Patritti testified that, in that conversation, Glassell said that he (Patritti) "had bought the property and the property was mine and therefore I would do all the negotiating on it"; that Baker said, "I will pay $4,200 for the property and I can't pay any more until the thing goes to condemnation."

Patritti testified further that prior to February 3 "we" had discussed with Baker "the existence of the two escrows"; on February 3 (when Baker was not present), Glassell told Patritti that he (Patritti) "was doing a good job, to go ahead and negotiate with the State and try to get them up to $5,000, if I could get them up to 5,000 but not to go to court"; Glas-

sell "reminded" Patritti that he wanted $3,150 an acre "for sure" net to him; Patritti told Glassell that he would "guarantee him $3,150"; he also told Glassell that, "If I got less, if, in case, we did have to go into court, I would stand the difference."

After February 3, Patritti continued to negotiate with the state for a sale of the property.

On March 1, Patritti requested the planning commission to "reactivate" the tract, and put it on the "Agenda" as soon as possible. Patritti testified that he did so to "push" the state, to try to get the state to move a little faster. On March 15, at Patritti's request, the planning commission approved a withdrawal of the tentative tract map.

In March Mrs. Ord and the Glassells signed amendments to the escrow instructions, extending the time of the escrow to June 18, 1955.

Mrs. Ord testified that about April 18 she, Patritti, and Glassell had a conversation wherein Glassell said that he was going to Europe and would be gone 90 days; she told him that the escrow extension "would run out in June while he was in Europe" and that she should have another extension of the escrow; he replied that no extension was necessary because the agreement "that was signed between Gladstone Holmes and Mr. and Mrs. Glassell in case the State took the property," was still in effect; Patritti said that he could pay for the property if Mr. Glassell wanted the money; Glassell replied that he did not want the money, and "wait and see what the State would do on it."

Patritti testified that about a week before April 20, he, Mrs. Ord, and Glassell had a conversation wherein Glassell said that "we" had a contract, written by his attorney, and it does not have any expiration date on it, and you do not need anything more than that; Patritti said that he told Glassell that if Glassell needed the money, he (Patritti) "could let him have it on the $3,150"; Glassell replied that he did not need the money, and "for me to go ahead and negotiate with the State."

Glassell testified that he had no recollection of a visit from Patritti or Mrs. Ord on April 15, 16, 17 or 18; he left for Europe on April 18.

On June 6, 1955, the state commenced a condemnation action to acquire the property. The Glassells' answer in that action stated that they "admit" that they are the owners of the property. Also, in their answer they denied that any

other defendant had any interest in the property. The prayer of their answer was that the court order the payment of compensation to them, based on a value "in excess" of $5,000 per acre.

On September 12, the attorney for the Glassells sent a letter to Mrs. Ord, enclosing therein a check for $1,000 payable to her. The letter stated that the check was a return of the consideration paid by Gladstone for the option; that it appeared that the purpose of the option had failed, and that therefore Mrs. Ord was entitled to a return of the option money. The letter stated further that it was to advise that all option agreements or other agreements relative to the sale of the property were "hereby terminated and expired." The attorney sent copies of the letter to Patritti, Gladstone, and the escrow company.

On September 13, Gladstone filed an answer, in the condemnation action, in which it was alleged that Gladstone was a purchaser under an agreement, and was an equitable owner of the property; that the value of the property was $272,028. The prayer was that damages in that amount (the whole value) be awarded to Gladstone. (It is to be noted that Gladstone did not set forth specifically its purported interest in the property.)

On September 21, Mrs. Ord filed an answer, in the condemnation action, in which she alleged that she was a purchaser under an agreement, and was an equitable owner of the property; she had agreed to sell the property to Gladstone and Patritti; the value of the property was $272,028; she claimed that amount as damages in the event plaintiff took the property. The prayer was that damages in the amount of $272,028 (the whole value of the property), be awarded to her or to Gladstone and Patritti. (It is to be noted that Mrs. Ord did not set forth specifically her purported interest in the property.)

On September 26, the attorneys for Mrs. Ord, Patritti, and Gladstone sent a letter to the attorney for the Glassells in which they stated that Mrs. Ord "does not accept the purported cancellation of the option which she holds"; their clients had at all times been willing to comply with the written and oral agreements which Glassell had made and that their clients were still ready, able and willing to comply with the agreements. The check for $1,000, which had been sent to Mrs. Ord, was returned in that letter.

On December 16, 1955, Patritti, Mrs. Ord and Gladstone

commenced this action against the Glassells for a declaration of the rights of plaintiffs and the Glassells with respect to the property or the condemnation award.

On April 5, 1956, the Glassells, Mrs. Ord, Gladstone, and Patritti (who had not filed an answer in the condemnation action) stipulated that judgment might be entered, in the condemnation action, condemning the property upon payment of $226,690 ($5,000 an acre) into court for the benefit of the Glassells, Mrs. Ord, Gladstone, and Patritti. They stipulated further that $142,814.70 (representing $3,150 an acre) be paid to Mr. and Mrs. Glassell from said $226,690, and that the remainder, $83,875.30, ''shall be held in the registry of this court to be distributed and paid to W. M. Glassell, and Margaret S. Glassell, Gladstone Holmes, Inc., a corporation, Loretta M. Ord and Matt Patritti, in such sums and to such of such persons and corporations as the Superior Court of Los Angeles County, Pomona Department, shall determine in that certain proceeding styled, *Matt Patritti, et al.* vs. *W. M. Glassell* . . . No. Pomo. C -2354 . . . [this present action], and that said court in said proceeding . . .[this present action] shall determine and award to such of these persons and corporations such amounts as it shall determine, and shall determine all other issues between these parties so named in this paragraph pertaining to the land described in . . . [the condemnation action], and the material issues therein, and pertaining to any and all of the controversies between the parties named in this paragraph. It is further agreed and stipulated that the monies remaining in the registry of this court shall be held there until the disposition of . . . [this declaratory relief action].''

Judgment in the condemnation action was entered in accordance with the stipulation. The $226,690 was paid into court. $142,814.70 of that amount was paid to the Glassells. $83,875.30 was retained in court, pursuant to the stipulation. This present action in declaratory relief pertains to alleged rights of the Glassells, Gladstone, Mrs. Ord, and Patritti to the $83,875.30, which was the amount of the condemnation award in excess of $3,150 an acre.

In the present action, the Glassells filed a cross-complaint whereby they sought a declaration that the letter of September 2, 1954, from Patritti to the Glassells, the option signed by the Glassells and Mrs. Ord, the escrow instructions signed by the Glassells and Mrs. Ord, and the escrow instruc-

tions signed by Mrs. Ord and Gladstone "be declared can-
celled and of no further force and effect." They also sought
an order directing the clerk of the superior court to pay to
the Glassells the remainder of the award ($83,875.30) then
on deposit in court.

In the present action the court found, among other things,
that about September 22, 1954, the plaintiffs Patritti, Mrs.
Ord and the defendants Mr. and Mrs. Glassell "executed be-
tween themselves, a letter dated September 2, 1954, and a
document entitled 'Real Estate Option,' dated September 22,
1954 [the option signed by the Glassells and Mrs. Ord]; on
October 21, 1954, said parties executed 'Escrow Instructions'
. . . in compliance with said Real Estate Option [the instruc-
tions signed by the Glassells and Mrs. Ord]. . . . [A]t all of
said times the said plaintiffs and each and all of them acted
and were acting jointly; the rights created thereby in their
favor were and are joint; . . . each and all said plaintiffs
were the real parties in interest as to each and all of said
documents, which were executed and expressly made for the
benefit of and constituted the entire written contract between
the parties to this action, in relation to said real property.
. . . [T]he letter of September 2, 1954, the option agreement
of September 22, 1954, and the escrow agreement . . . were
all between the parties hereto, were parts of the same trans-
action, . . . were one contract made between, and became
and was an agreement of purchase and sale by the parties
hereto of" the property. The terms of that contract were that
defendants were to deposit, in escrow, a deed conveying the
property to plaintiffs and a policy of title insurance showing
that the title to the property was vested in plaintiffs; plain-
tiffs were to pay "into said escrow and to defendants"
$3,150 an acre for the property; plaintiffs were also to pay to
defendants one-half the proceeds thereafter derived from any
condemnation proceedings by, or any sale of the property to,
the state; defendants were to reserve "one-half of the oil
and mineral rights" in the property. The deposit of the deed
and title policy, and the deposit of the purchase price, were
concurrent conditions.

The court found further that the work performed by
Patritti in connection with the "rezoning and subdivision
approval, and condemnation" of the property was part of
the consideration which defendants were to receive, and did
receive, from plaintiffs under the contract; the money paid by

Patritti for engineering and for appraisals was paid by plaintiffs with the knowledge and consent of defendants.

The court found further to the effect that defendants, by their failure to deposit a deed and a title policy in the escrow, and by their conduct, waived the time limitation for the deposit, in escrow, of the purchase price of $3,150 an acre for the property; and that defendants received the purchase price of $3,150 an acre from the $142,814.70 paid into court by the state.

The judgment in the present action provided, as follows: Plaintiffs were entitled to $1,140.65 (paid by them for appraisal and engineering expenses), and $1,000 (paid for original option), and $39,730.87 (one-half of remainder of $83,875.30 after deducting expenses of all the parties). Defendants were entitled to $2,272.90 (paid by them for attorneys' fees and costs in condemnation action), and $39,-730.87. Plaintiffs were entitled to an undivided one-half interest in the oil and mineral rights pertaining to the condemned property. Defendants were ordered "to execute and deliver to" plaintiffs a grant deed and an assignment of an undivided one-half interest in the oil and mineral rights. That defendants take nothing on their cross-complaint.

■ Appellants contend that the evidence does not support the findings that the letter dated September 2, 1954 (from Patritti to the Glassells), and the option of September 22, 1954 (signed by the Glassells and Mrs. Ord), and the escrow instructions dated October 21, 1955 (signed by the Glassells and Mrs. Ord) were one contract of purchase and sale of the property by plaintiffs, as purchasers, and by defendants, as sellers; and that the rights of plaintiffs "created" by those documents were the "joint" rights of plaintiffs. Appellants argue that the trial judge made a new contract for the parties and improperly ordered specific performance of the contract.

The evidence shows that Gladstone Holmes did not exercise its option before September 10, 1954, or at all, and consequently it had not acquired any ownership in the land and did not have any interest to transfer to Mrs. Ord at the time it requested the Glassells to make an option agreement with her. It appears further that on August 18, 1954, at a time when Mrs. Ord did not have any ownership in the land (and when Gladstone's option to buy at $3,150 an acre had not expired), she made an agreement to sell the land to Gladstone

for $4,200 an acre. It appears further that when the Glassells made the option agreement with Mrs. Ord on September 22, Gladstone had no ownership in the land. Gladstone's option time had expired on September 10, 1954. According to Patritti's letter, dated September 2, 1954, he requested the Glassells to immediately cancel the Gladstone option. Patritti was authorized to ask for the cancellation of the Gladstone option, that option was cancelled by him. In any event, as above stated, Gladstone did not exercise its option.

As to Patritti, individually, he delivered his personal check for $1,000 to the Glassells as the consideration referred to in the Gladstone option; and he authorized the Glassells to apply the $1,000 as the consideration referred to in the Ord option. As of the time when the Ord option was given by the Glassells, it does not appear that Patritti, individually, had any ownership in the land. As of that time, however, it appears that Patritti had announced, in his letter of September 2, 1954, that if any part of the property should be sold to the state, the Glassells might reserve one-half of the oil rights and he would pay to the Glassells one-half of the net proceeds above $3,150 an acre, after deducting engineering costs, and in the event a condemnation proceeding should go to trial the legal expenses and costs should also be deducted. It thus appears that Patritti, individually, who then had no ownership in the property, was asserting that he would permit the Glassells, who were the owners of the property, to reserve one-half of their oil rights, and he would also permit them to have one-half of the net selling price of their property above $3,150 an acre, in the event the property was sold to or condemned by the state.

As to Mrs. Ord, the evidence shows that about two weeks after she obtained her option she opened an escrow and signed instructions relating to a sale by her to Gladstone Holmes for $4,200 an acre; and that about four weeks after she obtained her option she opened an escrow and signed instructions relating to a sale by the Glassells to her for $3,150 an acre. Gladstone Holmes did not pay any money into the Ord-Gladstone escrow. Mrs. Ord did not pay any money into the Glassell-Ord escrow. Patritti testified that the double escrow was set up to take care of Mrs. Ord's commission (as a real estate broker), and that the escrows would help increase the value as far as the state was concerned. Mrs. Ord testified that her option (from the Glas-

sells) was to protect her commission of 5 per cent on $3,150 an acre; and that the Ord-Gladstone escrow was to establish a new price of $4,250 an acre. (As above stated, Gladstone had previously declined to exercise its option to buy from the Glassells for $3,150 an acre.) It is apparent that Mrs. Ord did not intend to pay the purchase price of $141,750 into escrow or at all for the purpose of protecting her commission of $7,087.50, or for the purpose of paying the purchase price. She obtained extensions of time for closing the Glassell-Ord escrow, which extensions covered several months. The escrow was never closed and apparently she never intended to comply with the terms of the escrow. It is also apparent that Gladstone did not intend to pay the purchase price or to comply with the terms of the Ord-Gladstone escrow. It is apparent, as indicated in Mrs. Ord's testimony, that a purpose of the escrows was that if the state was going to take the property "we should be set up." According to the testimony of Mrs. Ord and Patritti it would seem they conceded that her interest in her escrow and option was to protect her commission as a broker.

In summary, with reference to the interests purportedly acquired by Gladstone, Patritti, and Mrs. Ord in the property by reason of the options, it appears that Gladstone acquired nothing under its option; that Patritti, individually, did not have an option; and that Mrs. Ord's alleged interest under her option was to protect her commission.

Neither Patritti nor Gladstone was a party to the Ord option or to the Glassell-Ord escrow. That option and the instructions in that escrow were signed only by Mrs. Ord and the Glassells. The letter of September 2 (from Patritti to the Glassells) was signed by Patritti; and it was approved by the Glassells who signed their names thereto. Mrs. Ord did not sign the letter. There is nothing in the Patritti letter of September 2, or the Ord option, or the Glassell-Ord escrow instructions which creates joint rights of all the plaintiffs in the Ord option or Glassell-Ord escrow. There was no evidence that the acts of any of the plaintiffs created joint rights of all the plaintiffs in the transaction with the Glassells.

It is to be noted that the claims of Gladstone and Mrs. Ord herein, that the interests of all the plaintiffs herein are joint interests, are inconsistent with their claims in the condemnation action. Gladstone, in its answer in the condemnation action, alleged that it was a purchaser under an agreement

and was an equitable owner of the property; and it asked that the whole value of the property ($272,028) be awarded to it. Mrs. Ord, in her answer in the condemnation action, alleged that she was a purchaser under an agreement and was an equitable owner of the property; that she had agreed to sell the property to Gladstone and Patritti; and she asked that the whole value of the property ($272,028) be awarded to her or to Gladstone and Patritti.

There was evidence that Patritti did negotiate with the planning commission about rezoning and subdividing the property; and that he negotiated with representatives of the Division of Highways about the value of the property in connection with the condemnation action. At a time when Gladstone had only an option to purchase the property, Gladstone as "Record Owner" filed an owner's statement with the planning commission.

The evidence does not support the findings, above referred to, (1) that the letter of September 2 (from Patritti to Glassells), the Ord option, and the Glassell-Ord escrow instructions were one contract of purchase and sale by plaintiffs, as purchasers, and by defendants, as sellers; and (2) that the rights "created" by those documents were the "joint" rights of plaintiffs.

Of course, the evidence as to the interests of the parties could have been presented in the condemnation action and their interests could have been determined therein. Section 1246 of the Code of Civil Procedure provides that each defendant in a condemnation action must, by answer, set forth his estate or interest in the property. Section 1246.1 of that code provides that where there are two or more estates or divided interests in the property, the plaintiff is entitled to have the amount of the award first determined as between the plaintiff and all the defendants claiming any interest therein; and thereafter in the same proceeding the respective rights of such defendant in the award shall be determined by the court and the award apportioned accordingly. For some undisclosed reason, however, defendants in the condemnation action elected to have the matter of apportioning part of the award ($83,875.30) determined in this declaratory relief action. As above shown, the answers of Gladstone and Mrs. Ord in the condemnation action did not set forth specifically their interests in the property. Each of those defendants alleged that he was "a purchaser under an agreement" and

"was an equitable owner." Patritti did not appear in the condemnation action but he signed the stipulation therein reserving apportionment of part of the award for this declaratory relief action. It thus appears that this present action is in effect a kind of substitute proceeding for the part of the condemnation proceeding wherein the award could have been apportioned according to the respective interests of the appearing defendants therein. The proof required of the plaintiffs in this declaratory relief action, to establish their interests in the Glassell property, is not of less degree than the proof that would have been required of them in the condemnation action. Undoubtedly the Ord option, and the Ord escrows, a considerable portion of the rezoning and subdividing endeavors, and the various extensions of time regarding the escrows and rezoning and subdividing matters were designed by plaintiffs to indicate separate transactions and higher values of the property. In such process the original uncomplicated option transaction was abandoned, and the other transactions relative to the alleged purchase became complicated. Any difficulty in establishing the legal rights, if any, of individual plaintiffs under such circumstances is attributable of course to the intricate process employed in endeavoring to acquire an interest in the condemnation award.

The judgment is reversed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied September 22, 1959, and respondents' petition for a hearing by the Supreme Court was denied October 28, 1959.